UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
KAREN MCMAHON,

                        Plaintiff,

            -v-                                    5:16-CV-922
TOMPKINS COUNTY, NEW YORK,

                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
APPEARANCES:                              OF COUNSEL:

OFFICE OF EDWARD E. KOPKO                 EDWARD E. KOPKO, ESQ.
Attorneys for Plaintiff
308 N. Tioga Street, 2nd Floor
Ithaca, NY 14850

OFFICE OF TOMPKINS COUNTY                 JONATHAN WOOD, ESQ.
    ATTORNEY
Attorneys for Defendant
125 East Court Street
Tompkins County Office Building
Ithaca, NY 14850

DAVID N. HURD
United States District Judge

## DECISION and ORDER

## I. INTRODUCTION

Plaintiff Karen McMahon ("McMahon" or "plaintiff"), a corrections officer employed by

the Sheriff's Office, filed this civil rights action against her employer, defendant Tompkins

County, New York (the "County" or "defendant"), alleging violations of her rights under Title

VII of the Civil Rights Act of 1964 ("Title VII") and related state law.

On October 7, 2016, the County moved under Federal Rule of Civil Procedure ("Rule")

12(b)(6) seeking to dismiss McMahon's complaint in its entirety. The motion has been fully

briefed and will be decided on the basis of the submissions without oral argument.

## II. **BACKGROUND**

The following facts are taken from McMahon's complaint and are assumed true for purposes of resolving the County's motion to dismiss.

On May 15, 2000, the County hired McMahon, a lesbian, as a corrections officer. Compl. ¶¶ 12-13. In September of 2001, plaintiff "lost a substantial amount of body weight and as a result her uniform pants did not properly fit her." Id. ¶ 15. Plaintiff's supervisor, Chief Debra Niemi ("Chief Niemi"), refused to process plaintiff's request for "alternative uniform pants." Id. ¶ 16.

On August 14, 2002, McMahon underwent surgery. Compl. ¶ 17. While she was in the hospital, she received a telephone call from Anita Fitzpatrick, the County's Commissioner of Personnel ("Commissioner Fitzpatrick"). Id. Commissioner Fitzpatrick told plaintiff that "she did not have an accrual of disability benefit time and would not be paid by" the County. Id ¶ 18. According to plaintiff, Jackie Yoder, a Benefits Manager for the County, told her that she had accrued 10 weeks of disability time. Id. Plaintiff filed a grievance through her union about this issue. Id ¶ 19.

On October 2, 2002, the County sent McMahon a letter stating that plaintiff "needed to personally pay her health insurance premium as she was not currently on the payroll." Compl. ¶ 20.

On November 20, 2002, County Sheriff Peter Meskill ("Sheriff Meskill") presented a grievance settlement to McMahon. Compl. ¶ 21. At the time, Sheriff Meskill told plaintiff that "if she wanted to have a good Christmas for her children, she should sign the agreement." Id

In August of 2003, Chief Niemi "berated and harassed McMahon because [she] did not volunteer to work additional hours on behalf of another corrections officer, although McMahon had worked many shifts in excess of her required schedule." Compl. ¶ 22.

On October 31, 2003, Chief Niemi issued a written disciplinary memorandum to McMahon "falsely alleging that [she] had failed to obey an order." Compl. ¶ 23. According to plaintiff, Chief Niemi issued a second disciplinary memorandum "falsely alleging that [she] had improperly interacted with inmates." Id. ¶ 24.

On December 1, 2003, Lieutenant Raymond Bunce ("Lt. Bunce") denied McMahon's request for time off even though the "minimum staffing requirement was met." Compl. ¶ 25.

Around July 1, 2004, McMahon received another written disciplinary memorandum "falsely alleging improper professional behavior on June 12, 2004." Compl. ¶ 26.

On March 5, 2005, someone ordered McMahon to "stay away from the housing unit of an inmate due to the inmate falsely alleging improper conduct against [her]." Compl. ¶ 27.

On March 16, 2005, someone reassigned McMahon to another shift after an inmate threatened her. Compl. ¶ 28.

On June 14, 2005, the County denied McMahon "use of disability time that she was entitled [to] and charged 8 hours of vacation time instead." Compl. ¶ 29.

On October 23, 2005, Chief Niemi changed McMahon's "time card by charging [plaintiff] with the use of [three-and-a-half hours] of personal time that should have been charged [as] . . . holiday time." Compl. ¶ 30.

On March 2, 2007, a representative from the County's Personnel Office contacted "First Choice" to set up an Independent Medical Exam ("IME") for McMahon after she was

"taken out of work by her medical professional." Compl. ¶ 31. According to plaintiff, "other officers were not subject to an IME as quickly as she had been." Id. ¶ 32.

On April 12, 2007, Lt. Bunce telephoned McMahon to "falsely alleg[e] that [she] had improperly served legal process upon a third party." Compl. ¶ 33.

On April 30, 2007, someone stated to McMahon that "she was prohibited from serving legal process on anyone without the consent of the Sheriff." Compl. ¶ 34. When plaintiff asked Lt. Bunce "for the authority for his verbal reprimand," he stated that "he was the authority." Id. ¶ 35.

On December 12, 2008, Sheriff Meskill reduced McMahon's pay "by an additional one quarter hour alleging that she was not at work, when she actually was." Compl. ¶ 36. Plaintiff filed a grievance about this issue with her union. Id. ¶ 37.

On December 16, 2008, Chief Niemi telephoned McMahon shortly after she had finished a shift and told her "that she is not to write in the control room log book the comings and goings of certain specific employees, inclusive of herself." Compl. ¶ 38.

On October 14, 2009, McMahon attended a Labor-Management meeting in her capacity as the President of the County's Correction Officers Union Local 2062. Compl. ¶ 39.

On October 28, 2009, McMahon received a Counseling Memorandum alleging she had failed to report for duty on October 25. Compl. ¶ 40.

On November 12, 2009, McMahon filed a grievance with her union because she was not paid for work she performed on October 25. Compl. ¶ 41.

On December 29, 2009, Chief Niemi and Lt. Bunce "harassed and yelled at" McMahon about a union member and "his disability." Compl. ¶ 42.

On September 15, 2010, Chief Niemi yelled at McMahon, alleging that she was "starting rumors and making statements to a local newspaper about the Sheriff's Office." Compl. ¶ 43.

On September 30, 2010, Jeff Potter, a fellow corrections officer, "glared at" McMahon and stated that "someone started rumors about him to members of the Groton Rotary Club." Compl. ¶ 44. Plaintiff and other corrections officers reside in Groton, New York. Id. ¶ 45.

On May 2, 2011, Commissioner Fitzpatrick altered McMahon's time card and "deplete[d]" her "disability fringe time by eight hours" without plaintiff's consent. Compl. ¶ 46. Plaintiff filed a grievance about this issue with her union. Id. ¶ 47.

On June 14, 2011, McMahon asked Sergeant Matt DeMatteo ("Sgt. DeMatteo"), her shift supervisor, why she "could not receive a hard copy of the department Policy and Procedure manual as other officers (male) were being issued them." Compl. ¶ 48. Plaintiff alleges that Sgt. DeMatteo stated to her that "she was a minority and a female and that was the way it was." Id.

On June 15, 2011, Lt. Bunce spoke to McMahon about "bothering" Sgt. DeMatteo. Compl. ¶ 49. At that time, Lt. Bunce stated that plaintiff "wasn't getting the manual. Period." Id.

On June 16, 2011, Lt. Bunce handed McMahon "an old empty binder and papers instructing her to put her own manual together." Compl. ¶ 50.

On June 19, 2011, McMahon wrote to Sgt. DeMatteo "asking him to make time so they could talk." Compl. ¶ 51.

On June 20, 2011, Lt. Bunce spoke to McMahon in Sgt. DeMatteo's presence "about an alleged act of insubordination."  Compl. ¶ 52.

On June 23, 2011, someone gave McMahon a "written Performance Correction notice making note of a 'verbal correction.'" Compl. ¶ 53.

On April 15, 2012, Lt. Bunce placed McMahon on light duty after her personal physician indicated she was capable of performing light duty tasks.  Compl. ¶ 54.  However, Lt. Bunce assigned plaintiff "to duties inconsistent with her present physical injuries."  Id. ¶ 55.[1]  When plaintiff told Lt. Bunce that "she experienced pain while sitting and typing all day," he stated that "she should type with one hand or one finger and that he did not care if she was injured."  Id ¶ 56.

On April 20, 2012, while McMahon's mother was dying, she asked Lt. Bunce if she could "remain on her shift working in the control room so that she could continue to work, attend to her physical therapy, and care for her mother."  Compl. ¶¶ 57-58.  However, he denied her request and stated there was no light duty available in the control room.  Id.  According to plaintiff, "other correction[s] officers had performed light duty in the control room and [ ] they still do."  Id. ¶ 60.

Around 6:00 or 7:30 that evening, Commissioner Fitzpatrick contacted McMahon to ask how she "could work a second job while she was on light duty with a shoulder injury."  Compl. ¶ 61.

_____

[1]  McMahon's complaint begins to refer to Lt. Bunce as "Capt. Bunce."  Compare, e.g., Compl. ¶¶ 49-50, with, e.g., id. ¶¶ 52, 55-56.  For the sake of consistency, this recitation of the facts neglects to adopt the unexplained change in title.

On May 13, 2012, McMahon requested bereavement time off after her mother passed away. Compl. ¶ 62. Lt. Bunce waited to tell plaintiff that her leave had been approved until 8:00 a.m. the morning of her mother's funeral. Id. ¶ 63.

On November 19, 2012, McMahon filed a grievance with her union about certain lost pay and benefit time. Compl. ¶ 64.

On November 26, 2012, Chief Niemi instructed McMahon that "she had to sign her name to inmate request forms, not a badge number." Compl. ¶ 65. According to plaintiff, she "was aware that other officers [ ] only signed their badge numbers to the requests." Id. ¶ 66.

On December 9, 2012, McMahon received a "performance correction alleging that she had abused her benefit time by taking a personal day in November 2012 knowing that she did not have personal time accrued." Compl. ¶ 67. Plaintiff alleges that she did have personal time to use, and claims that Chief Niemi improperly charged her for certain time. Id. ¶ 68.

On February 5, 2013, someone denied McMahon's request to take on overtime work that another corrections officer "was being forced to accept." Compl. ¶ 69. Plaintiff alleges that "many officers are given the opportunity to accept overtime after an officer has been forced." Id. ¶ 70.

On April 8, 2013, McMahon attempted to return defective footwear, but "was told that there was no control over a company's warranty or return policy." Compl. ¶ 71. According to plaintiff, "two other officers were allowed to return their footwear manufactured by the same company." Id. ¶ 72.

In May of 2013, Lt. Bunce ordered McMahon "to not post anything on the Union board in the briefing room." Compl. ¶ 73. Plaintiff told Lt. Bunce that Sergeant Pat Masters ("Sgt.

Masters") "was performing actions that were improper, illegal, abusing his title as a sergeant and [Lt.] Bunce had no say in the discussion of matters within the union body." Id. ¶ 74.

In June of 2013, Lt. Bunce told McMahon that she incorrectly wrote up an incident report. Compl. ¶ 75. Plaintiff allege that "many officers' reports are wrong without being corrected or addressed. Id. ¶ 76.

On October 2, 2013, Sgt. Masters "allowed McMahon to be harassed, berated and belittled by professional visitors in the jail while attempting to perform her job duties." Compl. ¶ 77.

On January 30, 2014, McMahon's union demanded arbitration on her behalf against the County based on a light duty grievance she had filed earlier that month. Compl. ¶ 78. According to plaintiff, she "was compelled to return to work for an off duty injury although there is no language in the [collective bargaining agreement] about light duty." Id. Plaintiff alleges that Lt. Bunce informed her that he "assigns her duties other than control room for light duty because she is capable of performing other administrative tasks, more so than other officers." Id ¶ 79.

In February of 2014, McMahon asked Lt. Bunce "for a reasonable accommodation of specific days off for health reasons." Compl. ¶ 80. He refused. Id. ¶ 81.

On April 15, 2014, McMahon and Lt. Bunce "had a discussion" about his management of the Corrections Division. Compl. ¶ 82. At the time, plaintiff complained he had been violating her rights. Id. Later that evening, plaintiff learned that a previously approved leave request had been denied. Id. ¶ 83. According to plaintiff, "many other officers are allowed to leave shift early in the same manner as she had requested." Id ¶ 84.

On May 13, 2014, McMahon sought medical attention for an injury she sustained to her right knee.  Compl. ¶ 85.

On May 30, 2014, McMahon's union demanded arbitration on her behalf against the County for a grievance she had filed on April 23.  Compl. ¶ 86.

On July 30, 2014, McMahon's union demanded arbitration on her behalf against the County for a grievance she had filed on July 3.  Compl. ¶ 87.

McMahon's alleges that Captain Brett George ("Captain George"), another member of the County Sheriff's Office but employed by a different division, is her neighbor.  Compl. ¶ 88. Plaintiff claims Captain George "did provide information to other individuals in the neighborhood' about plaintiff's "disability."  Id.  As a result, individuals in the neighborhood harassed plaintiff "almost daily."  Id.  Plaintiff also alleges that Captain George "allowed videotaping of [plaintiff] from his property."  Id.

On September 9, 2014, Sheriff Kenneth Lansing ("Sheriff Lansing") "presented McMahon with a document stating that if she resigned her position . . . she would not be prosecuted for the felony by police officers."  Compl. ¶ 90.  Plaintiff refused.  Id. ¶ 91.

On September 16, 2014, McMahon received a notice of discipline alleging that she had "falsely claimed to be totally disabled and incapable [of] performing her duties as a corrections officer."  Compl. ¶ 89.  This notice further alleged that plaintiff had "falsely represented her medical condition to the workers compensation insurance provider" and to other supervisory officials at the County Sheriff's Office.  Id.  The same day, police officers with the County Sheriff's Office arrested McMahon and charged her with filing a fraudulent insurance claim, a felony offense.  Id. ¶ 92.

On October 27, 2014, Lt. Bunce wrote a letter to the New York State Division of Criminal Justice Services ("DCJS") stating that McMahon was arrested." Compl. ¶ 94. According to plaintiff, she had been seeking a "waiver for the NYS Security Guard training program" at the time. Id.

At some point after McMahon's arrest, County Assistant District Attorney Eliza Filipowski ("ADA Filipowski") presented charges to the grand jury based on the conduct for which plaintiff had been arrested. Compl. ¶ 95. However, the grand jury refused to indict plaintiff. Id.

Thereafter, an arbitrator rejected each of the charges initiated by the County Sheriff's Officer and ordered that McMahon be reinstated to employment and made whole for all monetary losses." Compl. ¶ 96. Since being reinstated, plaintiff "has been subjected to comments making light of her arrest, ridiculed and was made aware of derogatory comments made regarding her character." Id. ¶ 97.

McMahon alleges that she is aware of other officers being found guilty of falsifying time sheets and not being charged with a crime. Comp. ¶ 98. Plaintiff further alleges that she is aware of other officers performing second jobs while out on disability who were not investigated. Id. ¶ 99. Plaintiff alleges she "has been given many additional assignments since her return without being given time and space to complete the duties." Id ¶ 101. As a result, she "fears retaliation." Id.

On April 29, 2016, the Equal Opportunity Employment Commission ("EEOC") issued to McMahon a Notice of Right to Sue letter. Compl. ¶ 5. Plaintiff filed this action on July 26, 2016.

## III.  LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  Ginsburg v. City of Ithaca, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Although a complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief' (FED. R. CIV. P. 8(A)(2)), more than mere conclusions are required."  Id.  "Indeed, '[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).  "Dismissal is appropriate only where plaintiff has failed to provide some basis for the allegations that support the elements of his claims."  Id.; see also Twombly, 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is plausible on its face").

"When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor."  Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 344 (N.D.N.Y. 2014) (Baxter, M.J.).  In making this determination, a court generally confines itself to the "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken."  Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

## IV. DISCUSSION

### A. Title VII Discrimination

McMahon asserts a Title VII claim for discrimination.  According to the County, this claim must be dismissed because Title VII does not protect against sexual orientation discrimination and, even assuming otherwise, her claim is untimely.  Plaintiff's brief in opposition does not attempt to engage with these arguments but rather asserts quite simply that her complaint "contains all of the necessary allegations to overcome a motion to dismiss."

It does not.  At the pleadings stage, Title VII "requires a plaintiff asserting a discrimination claim to allege two elements:  (1) the employer discriminated against him (2) because of his race, color, religion, sex, or national origin." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015).

"As to the first element, an employer discriminates against a plaintiff by taking an adverse employment action against him." Vega, 801 F.3d at 85.  "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted).

"An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted).  "Examples of materially adverse changes including termination of employment, a demotion evidence by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Vega, 801 F.3d at 85.

"As to the second element, an action is 'because of' a plaintiff's race, color, religion, sex, or national origin where it was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action."  Vega, 801 F.3d at 85 (citation omitted).  In other words, "a plaintiff in a Title VII case need not allege 'but-for' causation."  Id.

"At the pleadings stage, then, a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination."  Vega, 801 F.3d at 87 (citing Littlejohn v. City of N.Y., 795 F.3d 297, 310 (2d Cir. 2015)).

After reviewing the allegations in McMahon's complaint and considering her seven-page opposition memorandum, plaintiff's Title VII discrimination claim fails to pass muster even under this generous standard.

First, as the County points out, Title VII "provides no remedy for discrimination based upon sexual orientation."  Harder v. New York, 117 F. Supp. 3d 157, 165 (N.D.N.Y. 2015) (citation omitted).  Accordingly, to the extent that McMahon's decision to specifically plead her sexual orientation suggests that she believes it is relevant to this analysis, Compl. ¶ 13, it cannot be considered a protected class for purposes of determining whether or not she has stated a Title VII claim.

Even if Title VII did in fact provide such protection, McMahon's pleading appears to offer up her sexual orientation gratuitously, since none of her allegations attempt to draw any causal connection between the alleged misconduct undertaken by the various actors in her

complaint and her sexual orientation.[2]  Nor does she allege that other individuals outside her protected class were treated more favorably.

In fact, the vast majority of the factual allegations in McMahon's complaint, which details events over a fourteen-year period going back to the beginning of her employment with the County in May of 2000, are barred by Title VII's 300-day statute of limitations.

"Title VII requires that individuals aggrieved by acts of discrimination file a charge with the [U.S. Equal Employment Opportunity Commission] within 180 or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days 'after the alleged unlawful employment practice occurred.'"  Vega, 801 F.3d at 78-79 (quoting 42 U.S.C. § 2000e-5(e)(1)); see also Jiles v. Rochester Genesee Regional Transp. Auth., 217 F. Supp. 3d 688, 690 (W.D.N.Y. 2016) ("Because New York is a so-called dual-filing or deferral state, a plaintiff must file a charge under Title VII within 300 days of the occurrence of a discriminatory act.").

As the Supreme Court has explained, the word "practice" in the Title VII employment discrimination context refers to "a discrete act or single 'occurrence,'" meaning that a "a discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'"  Vega, 801 F.3d at 79 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110-11 (2002)).  Consequently, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."  Morgan, 536 U.S. at 113.

---

[2]  The result would be the same if McMahon's complaint is construed as asserting a claim based on a failure to conform to gender stereotypes, since nowhere in her pleading does she make any sort of allegation to that effect.  See, e.g., Christiansen v. Omnicom Grp., Inc., 852 F.3d 195, 199-200 (2d Cir. 2017) (discussing Supreme Court's recognition of that theory of sex discrimination as viable under Title VII).

McMahon claims that she filed a charge of discrimination with the EEOC on July 9, 2015, making September 12, 2014, the relevant 300-day time period for purposes of Title VII. Accordingly, plaintiff's allegations of discriminatory acts occurring prior to that date are time barred and must be dismissed.

In her opposition, McMahon seeks to have the incidents from that period considered timely under Title VII's "continuing violation exception." Under this exception, "if a plaintiff files a timely EEOC charge 'as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone.'" Edner v. NYCTA-MTA, 134 F. Supp. 3d 657, 663 (E.D.N.Y. 2015) (quoting Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 155-56 (2d Cir. 2012)).

Generally speaking, "[t]he continuing violation exception applies to cases involving specific discriminatory policies or mechanisms such as discriminatory seniority lists, or discriminatory employment tests." Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993) (internal citations omitted), overruled on other grounds by Greathouse v. JHS Sec. Inc., 784 F.3d 105 (2d Cir. 2015).

Accordingly, this doctrine is inapplicable to "discrete acts" of discrimination, even if they are "related to acts alleged in timely filed charges." Edner, 134 F. Supp. 3d at 664 (citation omitted); see also Cabrera v. NYC, 436 F. Supp. 2d 635, 642 (S.D.N.Y. 2006) ("The Second Circuit has repeatedly ruled that 'multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation.'" (citation omitted)).

"Such discrete acts include termination, disparate disciplining, and negative performance evaluations." <u>Edner</u>, 134 F. Supp. 3d at 664 (collecting cases); <u>see also</u> <u>Pietri v. N.Y.S. Office of Court Admin.</u>, 936 F. Supp. 2d 120, 134 (E.D.N.Y. 2013) ("Discrete acts of discrimination include termination, failure to promote, denial of transfer, or refusal to hire.").

McMahon seeks to cast the allegations in her complaint as part of a pattern of discrimination, but virtually all of the conduct that she describes is precisely the sort of discrete instances of misconduct to which the continuing violation does not apply.

Notably, "[t]he continuing violation[ ] doctrine is disfavored and courts are hesitant to apply it absent a showing of compelling circumstances." <u>Boza–Meade v. Rochester Hous. Auth.</u>, 170 F. Supp. 3d 535, 545 (W.D.N.Y. 2016) (citation omitted).  Because the litany of incidents described in McMahon's complaint do not plausibly form part of a "continuing violation" for purposes of Title VII, they are time-barred.  <u>See</u> id. ("A continuing violation may not be premised on discrete incidents of discrimination not related to discriminatory policies or mechanisms."  (citation omitted)).

The remaining allegations in McMahon's complaint fail to state a plausible claim.  According to her timely allegations, the County served plaintiff with a notice of discipline alleging that she had falsely represented her medical condition to her employer and to other entities.  <u>See</u> Compl. ¶ 89.  In addition to the notice of discipline, plaintiff was arrested on a felony charge for similar alleged misconduct.  <u>Id</u>. ¶ 92.  Thereafter, Lt. Bunce wrote to DJCS stating plaintiff had been arrested.  <u>Id</u>. ¶ 94.  And in connection with plaintiff's arrest, ADA Filipowksi presented those charges to a grand jury, which refused to indict her.  <u>Id</u>. ¶ 95.  Plaintiff alleges that she returned to work after an arbitrator also rejected the

County's charges of misconduct. Id. ¶ 96. And upon her return, she has been "made aware of derogatory comments made regarding her character." Id. ¶ 97.

First, any insensitive comments made by one or more of unspecified co-workers are insufficient bases on which to sustain a Title VII disparate treatment claim. See, e.g., Davis v. NYS Dep't of Corr. Attica Corr. Facility P.O. Box 149 Attica, N.Y. 14011, 46 F. Supp. 3d 226, 236 (W.D.N.Y. 2014) ("Whispering, gossiping, and making negative comments about an employee [ ] do not rise to the level of an adverse employment action . . . .").

Second, McMahon's description of her arrest and subsequent return to work, while no doubt distressing, fails to include any explanation of how this series of events resulted in a materially adverse change in the terms and conditions of her employment. Cf. Jaeger v. N. Babylon Union Free Sch. Dist., 191 F. Supp. 3d 215, 227 (E.D.N.Y. 2016) ("Courts in this Circuit have held that investigations alone are . . . not adverse employment actions." (citation omitted)).

However, drawing all inferences in McMahon's favor, it can be gleaned from the complaint that plaintiff may have been temporarily placed on some form of unpaid leave or probation. See Compl. ¶ 96 (alleging the arbitrator "ordered that McMahon be reinstated to employment and made whole for all monetary losses").

That kind of change in working conditions can be sufficient for purposes of Title VII. Cf. Johnson v. Long Island Univ., 58 F. Supp. 3d 211, 223 (E.D.N.Y. 2014) (holding that an employer's reprimand is not an adverse employment action in the absence of other negative results such as a decrease in pay or being placed on probation). But even this allegation suffers from an overarching failure by McMahon to allege any sort of causal

connection between her protected status as a female and any of the allegedly adverse employment actions that occurred.

"An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" Littlejohn v. City of N.Y., 795 F.3d 297, 312 (2d Cir. 2015) (quoting Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009)).

McMahon alleges that she is "aware of" other corrections officers who falsified time sheets but were not charged with a crime. Compl. ¶¶ 98, 100. She also alleges that other officers worked other jobs on disability without being investigated. Id. ¶ 99. And since she has been back at work, she has been "given many additional assignments." Id. ¶ 101.

But nothing in McMahon's complaint plausibly suggests that her gender was a "substantial" or "motivating" factor behind any of this unfairness. See Vega, 801 F.3d at 85; see also Moultrie v. Carver Found., 669 F. App'x 25, 26 (2d Cir. 2016) (summary order) ("Due to the absence of any specific allegations in [plaintiff's] complaint giving rise to an inference of [discrimination], the complaint must be dismissed for failure to state a claim upon which relief can be granted.").

On the contrary, the tenor of McMahon's allegations seem to be little more than an invitation to second-guess her employer's decision-making. Simply put, this Court does not sit as a kind of "super-personnel department." See, e.g., Damon v. Fleming Supermarkets, 196 F.3d 1354, 1361 (11th Cir. 1999) (noting that court is not concerned with whether

employment decision was "prudent or fair," but only with whether it was motivated by unlawful discriminatory animus). Accordingly, plaintiff's Title VII claim must be dismissed.

### B. <u>Hostile Work Environment</u>

Out of an abundance of caution, the allegations in McMahon's complaint have also been considered to determine whether they might state a plausible claim for a hostile work environment.

"A hostile work environment claim 'is a wholly separate cause of action designed to address other types of *work place* behavior, like constant jokes and ridicule or physical intimidation.'" <u>Hughes v. Xerox Corp.</u>, 37 F. Supp. 3d 629, 648 (W.D.N.Y. 2014) (citation omitted).

"To establish a hostile work environment under Title VII, . . . a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Littlejohn</u>, 795 F.3d at 320-21 (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)).

"This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." <u>Littlejohn</u>, 795 F.3d at 321 (quoting <u>Raspardo v. Carlone</u>, 770 F.3d 97, 114 (2d Cir. 2014)). "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." <u>Id</u>.

"In determining whether a plaintiff suffered a hostile work environment, [a court] must consider the totality of the circumstances, including 'the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Littlejohn, 795 F.3d at 321 (quoting Harris, 510 U.S. at 23).

At the outset, it is recognized that "a hostile work environment claim is treated as a continuing violation and treated as timely if one act contributing to the claim occurred within the 300-day period . . . ." Baroor v. N.Y. City Dep't of Educ., 362 F. App'x 157, 159 (2d Cir. 2010) (summary order). Accordingly, the otherwise-untimely allegations set forth in plaintiff's pleading will be considered in evaluating the plausibility of a hostile work environment claim.[3]

Yet even considering McMahon's time-barred allegations, any hostile work environment claim must fail. Merely pleading a series of generally unpleasant, undesirable, or even harmful behavior is insufficient; rather, a plaintiff must plausibly allege that the hostile work environment at issue was created *because of* one or more of protected characteristics. See Robinson v. Harvard Prot. Servs., 495 F. App'x 140, 141 (2d Cir. 2012) (summary order) (reiterating the causal requirement for hostile work environment claims)

As with the discrimination claim set forth above, McMahon repeatedly details instances in which she was subjected to increased or unfair scrutiny and marginal or unfavorable treatment. But there is no evidence that any of this mistreatment was causally related to any characteristic protected by the anti-discrimination laws. Accordingly, any hostile work environment claim must be dismissed. See Ortiz v. Metro. Transp. Auth., 615 F. App'x 702, 703 (2d Cir. 2015) (summary order) (affirming grant of summary judgment on hostile work

---

[3] At the same time, however, courts have cautioned that "[h]ostile work environment is not a vehicle for resurrecting time-barred claims of discrimination." Hughes, 37 F. Supp. 3d at 648.

environment claim where "most of the complained-of conduct bears no apparent connection to [plaintiff's] sex, race, or national origin").

## C. Retaliation

Finally, it is noted that McMahon invokes the word "retaliation" in her pleading, Compl. ¶ 101, and purports to bring a Title VII retaliation claim as her Second Cause of Action, id. ¶ 106. This claim must also be dismissed.

"[F]or a retaliation claim to survive a . . . motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him; (2) 'because' he has opposed any unlawful employment practice." Vega, 801 F.3d at 90.

In the context of a Title VII retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination." Vega, 801 F.3d at 90 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).

"This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII: '[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" Vega, 801 F.3d at 90 (quoting White, 548 U.S. at 64).

"As for causation, a plaintiff must plausibly plead a connection between the act and his engagement in protected activity." Vega, 801 F.3d at 90. "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." Id. "Unlike Title VII discrimination claims, however, for an adverse retaliatory action

to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action."  Id.

"Courts in the Second Circuit have taken a 'generous' view of retaliatory acts at the motion to dismiss stage."  Ingrassia v. Health & Hosp. Corp., 130 F. Supp. 3d 709, 723 (E.D.N.Y. 2015).  However, as the Supreme Court has cautioned, "[c]ontext matters."  White, 548 U.S. at 69.

McMahon's pleading fails to satisfy even this minimal standard.  The vast majority of plaintiff's complaint details what appears to be little more than back-and-forth conduct over a fourteen-year period between the County, plaintiff, her union, some supervisors, and some other corrections officers who appear to be co-workers.  In instances where plaintiff felt mistreated, she regularly grieved the situation, which often appears to resulted in some form of favorable resolution to her grievance.

More importantly for present purposes, McMahon's pleading does not provide any factual allegation, or combination of factual allegations, that plausibly gives rise to even an indirect inference that one or more of the actions plaintiff identifies as attributable to her employer, the County—assuming in the first place that these actions are sufficiently "adverse" in light of the lower standard applied in the retaliation context—were in any way somehow causally related to the protected conduct in which she engaged, informal or otherwise, over this fourteen-year period.  Accordingly, this claim will also be dismissed.

## IV. CONCLUSION

McMahon has failed to establish any plausible federal claims. Accordingly, supplemental jurisdiction over plaintiff's state law claims will be declined. See 28 U.S.C. § 1367(c)(3).

Therefore, it is

ORDERED that

1. The County's motion to dismiss is GRANTED in part and DENIED in part;

2. McMahon's Title VII claims are DISMISSED; and

3. McMahon's state law claims are DISMISSED without prejudice.

The Clerk of the Court is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

_____
United States District Judge

Dated: October 4, 2017
      Utica, New York.